# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JOHN MARK GREENER,

     Plaintiff

v.

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security Administration,

     Defendant

Case No.: 3:17-cv-00631-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 16, 20

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Plaintiff, who is proceeding pro se, filed an Opening Brief, which the court construes as a motion for reversal and/or remand. (ECF No. 16.) The Commissioner filed a Cross-Motion to Affirm and Opposition to Plaintiff's motion. (ECF Nos. 20, 21.)

After a thorough review, it is recommended that Plaintiff's motion for remand be granted; the Commissioner's cross-motion to affirm be denied; and, that this matter be remanded for further proceedings consistent with this Report and Recommendation.

## **I. BACKGROUND**

Plaintiff was diagnosed with HIV and AIDS in January of 1997, and began taking medications to control the infection and prevent other infections. (ECF No. 16 at 2.) Due to the side effects of the medication, he stopped working on June 1, 2004. (*Id.*) He filed a prior application for supplemental security income (SSI) under Title XVI of the Social Security Act.

(*Id.*) To be eligible for SSI benefits, an applicant must be, among other things, disabled, blind or at least 65 years old and have limited income and resources. On October 8, 2007, the Social Security Administration found him to be disabled due to HIV and peripheral neuropathy and side effects from his medications. (*Id.*) The SSI benefits from that application stopped in 2010 due to excess resources. (*Id.*)

On January 23, 2014[1], Plaintiff completed another application for SSI benefits under Title XVI of the Social Security Act, alleging disability due to HIV/AIDS, neuropathy, fibromyalgia, headaches, and hypersensitivity to heat. (Administrative Record (AR) 156-161, 191-202.) Plaintiff stated that his disability began on June 1, 2004; however, when a claimant applies for SSI benefits under Title XVI, the benefits can only be paid for the month following the month in which the application was filed. 42 U.S.C. § 1382(c)(7); 20 C.F.R. §416.335. The application was denied initially and on reconsideration. (AR 90-93, 97-102.)

Plaintiff requested a hearing before an administrative law judge (ALJ). (AR 103.) ALJ Eileen Burlison held a hearing on August 12, 2014. (AR 32-56.) Plaintiff, who represented himself, appeared and testified on his own behalf at the hearing. Testimony was also taken from a vocational expert (VE). On October 5, 2015, the ALJ issued a decision finding Plaintiff not disabled. (AR 13-26.) Plaintiff requested review, and the Appeals Council denied the request, making the ALJ's decision the final decision of the Commissioner. (AR 1-12.)

Plaintiff then commenced this action for judicial review under 42 U.S.C. § 405(g). Plaintiff claims that the ALJ's decision was in error for a multitude of reasons, including: (1) he was deemed disabled in 2007 based on the same conditions he currently claims make him

---

[1] The ALJ's decision and Plaintiff's motion refer to an application date of January 16, 2014, but the application in the record is dated January 23, 2014.

1  disabled, and there was no significant change in his condition during this time; (2) the ALJ did

2  not give the opinion of his treating physician, Dr. Antoine Bou Doumit, any weight; (3) the ALJ

3  stated that non-examining source opinions can never be given controlling weight, but then gave

4  great weight to those opinions; (4) the ALJ did not correctly evaluate his activities of daily

5  living; (5) the ALJ did not have a clear understanding of the severity of his conditions; (6) the

6  ALJ did not consider his HIV medications, dosages, and side effects; (7) the ALJ did not give

7  adequate weight to the lay witness statement of Erick R. McBride; and, (8) the ALJ was having

8  difficulty during the hearing.

9  **II. STANDARDS**

10 **A. Disability Process**

11        After a claimant files an application for disability benefits, a disability examiner at the

12 state Disability Determination agency, working with a doctor(s), makes the initial decision on the

13 claimant's application. *See* 20 C.F.R. §§ 404.900(a)(1); 416.1400(a)(1). If the agency denies the

14 claim initially, the claimant may request reconsideration of the denial, and the case is sent to a

15 different disability examiner for a new decision. *See* 20 C.F.R. §§ 404.900(a)(2), 416.1400(a)(2).

16 If the agency denies the claim on reconsideration, the claimant may request a hearing and the

17 case is sent to an ALJ who works for the Social Security Administration. *See* 20 C.F.R. §§

18 404.900(a)(3), 416.1400(a)(3). The ALJ issues a written decision after the hearing.

19 *See* 20 C.F.R. § 404.900(a)(3). If the ALJ denies the claim, the claimant may request review by

20 the Appeals Council. *See* 20 C.F.R. §§ 404.900(a)(4), 416.1400(a)(4). If the Appeals Council

21 determines there is merit to the claim, it generally remands the case to the ALJ for a new hearing.

22 If the Appeals Council denies review, the claimant can file an action in the United States District

23 Court. *See* 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.900(a)(5), 416.1400(a)(5).

**B. Five-Step Evaluation of Disability**

Under the Social Security Act, "disability" is the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his or her physical or mental impairment(s) are so severe as to preclude the claimant from doing not only his or her previous work but also, any other work which exists in the national economy, considering his age, education and work experience. 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step sequential process for determining whether a person is disabled.  20 C.F.R. §404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). In the first step, the Commissioner determines whether the claimant is engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 404.152(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

The second step requires the Commissioner to determine whether the claimant's impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(4)(ii), (c); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. *Id*. If the claimant has an impairment(s) that is severe, the Commissioner proceeds to step three.

In the third step, the Commissioner looks at a number of specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the claimant's impairment(s) meets or is the equivalent of one of the Listed Impairments. 20 C.F.R.

§ 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (d). The Commissioner presumes the Listed Impairments are severe enough to preclude any gainful activity, regardless of age, education or work experience. 20 C.F.R. § 404.1525(a), § 416.925(a). If the claimant's impairment meets or equals one of the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(a)(4)(iii), (d). If the claimant's impairment is severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past relevant work is that which a claimant performed in the last 15 years, which lasted long enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and § 416.920(a).

In making this determination, the Commissioner assesses the claimant's residual functional capacity (RFC) and the physical and mental demands of the work previously performed. *See id.;* 20 C.F.R. § 404.1520(a)(4)(v), § 416.920(a)(4)(v); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R. § 404.1545 and § 416.945. In determining the RFC, the Commissioner must assess all evidence, including the claimant's and others' descriptions of the limitation(s), and medical reports, to determine what capacity the claimant has for work despite his or her impairments. 20 C.F.R. § 404.1545(a)(3) and  416.945(a)(3).

A claimant can return to previous work if he or she can perform the "actual functional demands and job duties of a particular pat relevant job" or "[t]he functional demands and job duties of the [past] occupation as generally required by employers throughout the national

economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and citation omitted).

If the claimant can still do past relevant work, then he or she is not disabled. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131.

If, however, the claimant cannot perform past relevant work, the burden shifts to the Commissioner to establish at step five that the claimant can perform other work available in the national economy. 20 C.F.R. §§ 404.1520(e), 416.920(e); *see also Yuckert*, 482 U.S. at 141-42, 144. This means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 528 (9th Cir. 2014). If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a VE or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

"The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and citation omitted). The Grids place jobs into categories by their physical-exertional requirements, and there are three separate tables, one for each category: sedentary work, light work, and medium work. 20 C.F.R. Part 404, Subpart P, Appx. 2, § 200.00. The Grids take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels. *Id*. Each grid has various combinations of factors relevant to a claimant's

ability to find work, including the claimant's age, education and work experience. *Id*. For each

combination of factors, the Grids direct a finding of disabled or not disabled based on the

number of jobs in the national economy in that category. *Id*. The Grids may only be used where

they "completely and accurately represent a claimant's limitations." *Tackett*, 180 F.3d at 1101. If

a claimant suffers from non-exertional limitations, the ALJ may not apply the Grids because they

are only based on strength factors. *See* 20 C.F.R. Part 404, Subpart 2, App. 2, § 200.00(e); 20

C.F.R. §§ 404.1569a, 416.969a (defining non-exertional limitations as those that do not directly

affect a claimant's muscular strength). If a claimant's limitations are exertional and non-

exertional, the Commissioner must consult the Grids first, and if the person is disabled under the

Grids, there is no need to look at the effect of non-exertional limitations; however, if the person

is not disabled under the grids, the non-exertional limitations must be examined separately. *See*

*Lounsberry v. Barnart*, 468 F.3d 1111, 1115-16 (9th Cir. 2006).

If at step five the Commissioner establishes that the claimant can do other work which

exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566(b),

§ 416.966(b). Conversely, if the Commissioner determines the claimant unable to adjust to any

other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g), § 416.920(g); *see also*

*Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th

Cir. 2009).

**C. Judicial Review & Substantial Evidence**

The court must affirm the ALJ's determination if it is based on proper legal standards and

the findings are supported by substantial evidence in the record. *Gutierrez*, 740 F.3d at 522

(citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Id.* at 523-24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

To determine whether substantial evidence exists, the court must look at the record as a whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*, 740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being said, "a decision supported by substantial evidence will still be set aside if the ALJ did not apply proper legal standards." *Id.* (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

### III. DISCUSSION

**A. ALJ's Findings in this Case**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since his application date. (AR 18.)

At step two, the ALJ concluded Plaintiff had the following severe impairments: HIV with neuropathy and fibromyalgia. (AR 18.)

At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments. (AR 20.)

At step four, the ALJ assessed Plaintiff as having the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), except he could lift and carry 20 pounds occasionally and 10 pounds frequently; he could stand, walk and sit for six hours out of an eight-hour day; he could frequently climb, balance, stoop, kneel, crouch and crawl; and, he should avoid heat, vibration, and hazards such as working at heights and operating dangerous moving machinery. (AR 21.)

The ALJ then concluded Plaintiff was unable to perform any past relevant work. (AR 24.)

At step five, the ALJ determined, based on VE testimony, that considering Plaintiff's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including: File Clerk II (Dictionary of Occupational Titles (DOT) Number 206.367-014); General Office Clerk (DOT Number 209.562-010); and Food and Beverage Checker (DOT Number 211.482-018). (AR 26.) As a result, the ALJ found Plaintiff not disabled from the date of his application through the date of the decision. (AR 26.)

**B. Prior SSI Application**

Plaintiff argues that he was deemed disabled in 2007 based on the same conditions he currently claims make him disabled, and there was no significant improvement in his condition during this time; therefore, he insists he should have been found disabled with respect to his 2014 application.

It is not enough that Plaintiff was previously found disabled and paid SSI benefits. Those benefits terminated in 2010 due to increased resources, and Plaintiff waited until 2014 to file another application. At that point, Plaintiff had the burden of proving disability again. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).

The Ninth Circuit addressed this scenario in *Warren v. Bowen*, 804 F.2d 1120 (9th Cir. 1986). There, the claimant successfully applied for SSI benefits in 1978, but her benefits were suspended and then terminated shortly thereafter due to an increase in her husband's income. *Warren*, 804 F.3d at 1120-21. The claimant applied for SSI benefits against in late 1981, and she was denied benefits, with the ALJ finding her medical impairments did not preclude her from performing her past relevant work at the light level. *Id*. at 1121. The Ninth Circuit indicated that what was relevant was not the disability determination in 1978, but *whether she was disabled when she re-applied* in 1981. *Id*. The Ninth Circuit also held that "the eligibility of a recipient whose benefits have been terminated for non-medical reasons are governed by regulations." *Id*. There is a presumption of disability if the recipient re-applies and meets all the requirements for disability *for a year*, but that presumption did *not* extend to the claimant who *re-applied more than a year after* the non-medical termination. *Id*.; *see also Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008) (noting that the current regulations compel the same result).

Therefore, the fact that Plaintiff was found disabled in 2007 and received SSI benefits through 2010 does not compel a finding of disability when he re-applied in 2014.

**C. Medical Opinions**

    **1. Summary of Medical Evidence and Opinions**

    On December 5, 2002, Dr. Dino Gonzalez, of Southwest Medical Associates in Las Vegas, indicated Plaintiff suffered from chronic fatigue and recommended a reduction in work hours by two hours, indefinitely. (AR 282.)

    A February 23, 2007, letter from Dr. Salvatore Biazzo, also of Southwest Medical Associates in Las Vegas, indicated that Plaintiff had treated with him for several years for HIV, fibromyalgia, and severe peripheral neuropathy, and that Plaintiff suffered from a tremendous amount of pain in the past several years which incapacitated him from being able to do any type of active physical labor. (AR 283.) Dr. Biazzo further opined that Plaintiff was precluded from doing even sedentary tasks for more than one to two hours without taking at least a half-hour of rest. (*Id*.)

    On May 22, 2007, Dr. Craig N. Bash, reviewed Plaintiff's medical records to render a medical opinion regarding Plaintiff's ability to work as it related to his illnesses. (AR 284-285.) Dr. Bash noted that Plaintiff had HIV, fibromyalgia, peripheral neuropathy, hypergonadism, hyperlipidemia, irritable bowel disease and chronic pain. In his opinion, Plaintiff's aggregate medical problems made it impossible for him to work. The reasons for this were: (1) his neuropathic chronic pain and inability to sleep affected his attention span and ability to concentrate in a work setting; (2) his medications caused significant side effects which also caused a loss of the ability to concentrate; (3) he experienced irritable bowel syndrome, fatigue, vomiting, diarrhea, headaches, fever, chills, all likely secondary to the HIV which caused real functional problems; (4) his low testosterone levels contributed to his fatigue; (5) his illness caused loss of sleep and regular uncontrolled defecation which were not conductive to full or

part time work; (6) his headaches interfered with his ability to concentrate and think clearly; (7) his fatigue made it impossible for him to work; and (8) his illnesses and medication regimes required constant renewal and lab testing that were not compatible with full time work.

On January 23, 2013, he had a routine HIV therapy follow up appointment, and it was noted that his condition was well controlled with the current treatment. (AR 393.) He was extremely fatigued. (AR 395.) He was taking methadone and oxycodone for his fibromyalgia and neuropathy. At that time, he reported his pain was well controlled. (AR 393.) Since being placed on this regimen in 2008, he had put on weight, but experienced headaches, and his arthritic and nerve complaints were acting up. (AR 396.) He had some lipodystrophy (according to Plaintiff this is an issue with storing fat). (AR 397.)  Overall, it was stated that his HIV was "doing well" and that he would have a follow up in three months to see if his bodily complaints were improving. (AR 399.)

On May 2, 2013, he reported anxiety and poor sleep, for which medications were not effective. (AR 367-68.) It was noted that he had a longstanding history of sleep problems. (AR 367.)

On June 19, 2013, he reported minor abdominal bloating and nausea with GERD for a week, as well as occasional headaches. (AR 355.)

Plaintiff was seen on July 9, 2013, for a follow up for his HIV. (AR 348-351.) It was noted he was diagnosed in 1997, and was placed on a particular drug therapy and suffered severe lipoatrophy and neuropathy requiring chronic narcotic use for relief. He was placed on his new treatment regimen in 2008 and had put on weight. He had headaches. He was described as "doing well" and would be seen for a follow up in four months.

He was seen for evaluation and management of his fibromyalgia and HIV on August 26, 2013. (AR 335-340.) He reported episodes of severe nausea in the mornings and one day at a time every two to four months, and less severe nausea during the day every few weeks. He continued to have a lot of fatigue. He reported learning different "tricks" to lessen his pain. He did not attend pain management class because it was scheduled in the afternoon when his fatigue is at its worst. He indicated he had chronic pain allover.

He had a routine follow up on January 28, 2014, and was described as "doing well" and he continued to feel better of the old regimen. (AR 313.)

On February 3, 2014, he called for a refill for methadone and oxycodone, noting that he did not take the oxycodone all the time, only when his fibromyalgia became intolerable. (AR 308.)

On February 14, 2014, he reported having headaches that would sometimes affect his vision and made him very tired, that occurred three to four times a week. (AR 206.) He could resume his activities after resting for 30-40 minutes. (*Id*.)

On March 4, 2014, State agency consultant Navdeep S. Dhaliwal, M.D., opined, based on a review of Plaintiff's medical records, that Plaintiff could still perform work at the light level, except: he could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; he could stand, walk, and sit a total of about six hours in an eight-hour workday; he could climb ramps/stairs, balance, stoop, kneel, crouch and crawl frequently; he could never climb ladders, ropes or scaffolds; he should avoid even moderate exposure to heat and concentrated exposure to vibration, and all exposure to hazards. (AR 65-66.)

On May 21, 2014, at the reconsideration stage, Rene Pena, M.D., essentially affirmed the opinions of Dr. Dhaliwal. (AR 77-78.)

Dr. Antoine Bou Doumit, who followed him at the VA clinic, provided a statement on May 26, 2015. (AR 402.) He stated:

> Mr. John Greener is followed up by me at the VA clinic. He has HIV and is on therapy for that. He also has severe HIV related neuropathic pain and is maintained on high dose opioid therapy. He additionally gets nausea on an intermittent basis. He also suffers from widespread pain due to fibromyalgia.

(AR 402.)

### 2. Dr. Doumit

Plaintiff argues that the ALJ erred when she did not give his treating physician's opinion any weight.

The Commissioner asserts that a medical opinion is a statement from an acceptable medical source about what a claimant can still do despite his or her impairments, relying on 20 C.F.R. 20 C.F.R. § 416.927(a)(1).  The Commissioner contends that Dr. Doumit's statement does not offer an opinion regarding any functional limitations and the ALJ addressed separately Plaintiff's neuropathic pain, nausea and fibromyalgia; therefore, there was no opinion for the ALJ to reject.

In making this argument, the Commissioner omits a critical portion of the regulation defining medical opinions. The regulation states that medical opinions are "statements from acceptable medical sources *that reflect judgments about the nature and severity of* [the claimant's] *impairment(s), including* [the claimant's] *symptoms, diagnosis and prognosis*, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1) (emphasis added). The regulation goes on to state that "[i]n determining whether you are disabled, we will *always* consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 416.927(b)

(emphasis added). "Regardless of its source, we will evaluate *every* medical opinion we receive." 20 C.F.R. § 416.927(c) (emphasis added).

Dr. Doumit's statement undoubtedly reflects judgments about the nature and severity of Plaintiff's impairments, including his symptoms, diagnosis and prognosis. Therefore, it qualifies as a medical opinion.

"Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)). "In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.*

The ALJ's decision does not discuss or assign any weight to Dr. Doumit's opinion; therefore, the ALJ erred. While the ALJ may have discussed some of the issues raised in Dr. Doumit's opinion, such as his fibromyalgia, neuropathy and nausea, she did not discuss them in the context of Dr. Doumit's opinion so the court could conclude she adequately set forth specific and legitimate reasons for rejecting Dr. Doumit's opinion.

### 3. Non-Examining Source Opinions

Plaintiff argues that the ALJ stated that non-examining source opinions can never be given controlling weight, but she nevertheless gave great weight to those opinions.

The Commissioner argues that the existence of a treatment relationship is a factor the ALJ may consider, but is not dispositive in evaluating the weight to accord a medical opinion. In

15

addition, the Commissioner contends that the ALJ assigned these opinions great weight because they were the most recent opinions evaluating Plaintiff's functional abilities.

"'In disability benefits cases … physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).  "Courts 'distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physician); and (3) those who neither examine nor treat the claimant (nonexamining physicians).'" *Garrison*, 759 F.3d at 1012 (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).  "'As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.'" *Id*.

Here, the ALJ gave great weight to the opinions of the non-examining State agency medical consultants, stating they were consistent with the claimant's longitudinal treatment records, which reveal conservative treatment that has improved some of the claimant's symptomology. (AR 23.) The ALJ may have been justified in giving little weight to the opinions of Dr. Gonzalez, Dr. Biazzo and Dr. Bash, because they were rendered in 2002 and 2007, and therefore, had little relevance to Plaintiff's condition at the time of his second application for benefits. As was discussed above, the ALJ was required to discuss and assign weight to Dr. Doumit's opinion rendered in 2015.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec. Admin.,* 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may reject it by

providing specific and legitimate reasons that are supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (citation omitted). "[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be entitled to the greatest weight ... even if it does not meet the test for controlling weight." *Id*. (citation and quotation marks omitted).

In her failure address Dr. Doumit's opinion, the ALJ elevated the opinions of the non-examining State medical consultants over that of Dr. Doumit without providing clear and convincing or specific, legitimate reasons for crediting their opinions over the opinions of Dr. Doumit. "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996).

Additionally, even if an ALJ decides not to give a treating physician's opinion controlling, the ALJ must apply the factors set out in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) in determining how  much weight to give each opinion. *See Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017). The factors include: length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. Here, the ALJ did not acknowledge Dr. Doumit's opinion, and therefore did not discuss these factors in weighing the opinions of the non-examining consultants over Dr. Doumit's. The failure to consider these factors constitutes reversible legal error. *Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017).

**D. Activities of Daily Living**

Plaintiff argues that the ALJ did not correctly evaluate his activities of daily living.

The Commissioner argues that the ALJ properly noted the activities were inconsistent with the reports of disabling limitations, and that Plaintiff denied having difficulty with activities of daily living, and concluded that while he was somewhat limited, some of his abilities were the same as those required to maintain employment.

With respect to his activities of daily living, the ALJ stated the following:

> The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant testified that he could do light housework and drive. He also stated that he could care for his personal hygiene, though he also indicated he does not do so consistently. He indicated in his function report that he could do light housework including laundry, dishes, general picking up, and dusting (Exhibit 5E). He also reported he could walk and feed his dog, prepare simple meals, drive, shop for groceries, and handle his finances (Exhibit 5E). The record indicates that the claimant denied having difficulty with activities of daily living, and was observed to be appropriately dressed and adequately groomed (Exhibit 4F, pp. 80, 84). Thus, although the claimant's activities of daily living were somewhat limited, some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment and are inconsistent with the presence of an incapacitating or debilitating decision. The claimant's ability to participate in such activities undermined the credibility of the claimant's allegations of disabling functional limitations.

(AR 22.)

The court finds that the ALJ noted certain activities Plaintiff could perform, while ignoring statements regarding his limitations in performing those activities. The ALJ also ignored other evidence showing difficulties that Plaintiff faced. Moreover, the ALJ concluded that some of the physical and mental abilities and social actions required to perform the daily activities were the same necessary for obtaining and maintaining employment, without actually discussing what specific activities she was referring to, and how those activities translated to the work environment.

For instance, the ALJ said Plaintiff had no problems walking, but he stated in his adult function report (AFR) that his walking was limited to walking the dog for 10-15 minutes. (AR 208.) This was confirmed in the lay witness statement of Eric McBride. (AR 258.)

The ALJ also stated that Plaintiff was appropriately dressed and adequately groomed at the hearing. While Plaintiff may have been adequately groomed to come to a Social Security hearing, both Plaintiff and Mr. McBride reported that his grooming had slipped, and he no longer showered every day. (AR 208, 258.) Plaintiff specifically testified that he could take a shower and brush his teeth, but clarified that he did not do so on a regular basis. (AR 37.)

The ALJ found his ability to do housework, cleaning and shopping made his claims of disability less than credible. Plaintiff testified, however, that while he could do some cooking, cleaning and shopping, it was only a "very light amount." (AR 37.) This was also corroborated by Mr. McBride. (AR 258.)

The ALJ did not mention Plaintiff's statements about the way his fatigue impacted his ability to function. Plaintiff stated in his AFR that he would be active for three to four hours, but then fatigue would set in. (AR 207.) This is consistent with his testimony that he would get fatigued very easily. (AR 43.) He testified that he would be okay in the morning, but between 11:00 a.m. and 1:00 p.m., he would get severely fatigued and would take a nap or lie down. (AR 43.) This is corroborated by his medical records. (AR 206 ("very tired"); AR 340 ("continues to have a lot of fatigue"); AR 395 ("patient extremely fatigued")). In addition, his neuropathy and fibromyalgia caused enough pain to cause him to take heavy doses of narcotics which made him tired and unfocused. (AR 207.)

He testified that he would get headaches several times a week, and nausea from some of his medications. (AR 43.) At his February 14, 2014, appointment, he reported getting headaches

three to four times a week, that made him very tired. (AR 206.) Once he rested for 30-40 minutes, he could resume his activities. (*Id.*)

Plaintiff also stated on multiple occasions that he suffers from chronic insomnia. (AR 41, 43, 208.) This is confirmed in his medical records. (AR 367.)

Plaintiff testified, and Mr. McBride confirmed, that Plaintiff's ability to sit was limited due to his lipodystrophy (described as the loss of body fat in the legs and buttocks), but the ALJ did not specifically account for this.

The Ninth Circuit has cautioned that "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in a bed all day." *Garrison,* 759 F.3d at 1016 (citations omitted). Instead, the activities of daily living bear on credibility only "if [the] level of activity were inconsistent with [a claimant's] claimed limitations." *Id.* (citations omitted).

In *Garrison*, the ALJ either ignored or did not account for the claimant's testimony that while she could perform certain activities, she was in near-constant pain, had to take frequent rests, and could not carry heavy items. *Garrison*, 759 F.3d at 1015. There, the ALJ discredited the claimant's testimony on the basis that it was inconsistent with her daily activities including talking on the phone, preparing meals, cleaning her room and helping care for her daughter. *Id.* The Ninth Circuit concluded the ALJ erred where the ALJ did not account for the claimant's testimony that in performing many of the tasks she was assisted heavily by her mother, and was regularly precluded from doing the activities due to her pain and the need to rest. *Id.* at 1016.

In *Diedrich v. Berryhill*, 874 F.3d 634 (9th Cir. 2017), the Ninth Circuit similarly concluded that the ALJ erred. The court commented that the fact that the claimant could

1   "participate in some daily activities d[id] not contradict the evidence of otherwise severe

2   problems that [the claimant] encountered in her daily life during the relevant time period."

3   *Diedrich*, 874 F.3d at 643. While the claimant was capable of performing some household

4   chores, cooking simple meals, self-grooming, care for a cat in her home and occasional shopping

5   outside the home, the court said these were "not similar to typical work responsibilities." *Id*.

6   While the claimant was doing these tasks, the court observed, "she was likely not doing them

7   with the consistency and persistence that a work environment requires." *Id*. (citation omitted).

8         Here, as in *Garrison* and *Diedrich*, Plaintiff's daily activities, as described in his

9   testimony and the AFR, appear consistent with the statements about the impairments caused by

10   his pain. The ALJ ignored or did not account for the extent Plaintiff's ability to engage in these

11   activities was limited. Nor did the ALJ explain how doing these activities as described translated

12   to the ability to perform in a work environment. Therefore, the ALJ erred in discounting

13   Plaintiff's statements and testimony on this basis.

14   **E. Lay Witness Statement**

15         Plaintiff argues that the ALJ improperly discounted the lay witness statements of Eric

16   McBride, and that the ALJ should have given them more weight as a result of Mr. McBride's

17   background.

18         The Commissioner argues that the ALJ reasonably found the statements less persuasive

19   than the acceptable medical sources who examined Plaintiff and reviewed his medical records

20   and found his statements inconsistent with the clinical and diagnostic evidence. While Plaintiff

21   cites Mr. McBride's background as a reason for giving his statements additional weight, the

22   Commissioner maintains that he is not an acceptable medical source.

23

Eric McBride provided a statement dated March 9, 2015. (AR 258-259.) He indicated he had known Plaintiff for over 18 years, as they had been partners for the first 15 years and lived with each other during that time. He described Plaintiff's HIV diagnosis, and changes in his appearance and side effects from 2000 through 2007, including Plaintiff having to take sick leave from his job, and moved from Las Vegas to Reno because of the heat. Mr. McBride said that since 2013 he had noticed a decline in Plaintiff's health and activities, much of which he attributed to his doctors putting pressure on him to reduce the narcotic pain medications he was taking. His headaches had increased and his insomnia had worsened. Mr. McBride had to clean up after Plaintiff as a result of frequent incontinence. Plaintiff suffered from nausea causing vomiting. Mr. McBride reported that Plaintiff used to walk the dog every day, but that had been reduced to once or twice a week, and for only 10 minutes instead of 15. McBride indicated that Plaintiff could not do any housework and dishes and laundry would pile up. Plaintiff had no social activities or friends, and no longer showered every day.

Mr. McBride provided another statement dated August 12, 2015. (AR 272-73.) He indicated that he was an addiction therapist and employee with the State of Nevada Division of Child and Family Services. He described Plaintiff's condition through 2004, and again reported that since 2013, Plaintiff had a further decline in his health and activities. Mr. McBride reiterated having to care for Plaintiff due to incontinence; that Plaintiff suffered from nausea causing vomiting; that Plaintiff could not perform housework; Plaintiff had no social activities or friends; he no longer showered daily. In addition, he could not carry a five-pound box to another room without dropping it or putting it down. Mr. McBride indicated that he had observed Plaintiff having issues with peripheral neuropathy, lipoatrophy, fecal incontinence, and fatigue that continued to impact his daily life. He also has lipodystrophy (loss of body fat mostly in the legs

1  and buttocks) that made it difficult for him to sit for long periods. Plaintiff's medications affected

2  his mental functioning, including cognition, poor concentration, mood swings and sensitivity to

3  heat. Plaintiff suffered from severe fatigue, joint and muscle pain, and insomnia.

4       The ALJ indicated she read and considered the statements of Mr. McBride, and gave

5  them only partial weight because the opinions of a layperson are far less persuasive on the same

6  issues as are the opinions of medical professionals that were relied on. (AR 22.) The ALJ said

7  she considered the statements about the limitations and gave appropriate limitations, but that

8  McBride's statements about the limitations were not persuasive of additional restrictions in RFC

9  because the clinical or diagnostic medical evidence did not support his statements. (AR 22.)

10      "Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's

11  ability to work is competent evidence the ALJ must take into account." *Ghanim v. Colvin*, 763

12  F.3d 1154, 1165 (9th Cir. 2014) (internal quotation marks and citation omitted). "An ALJ may

13  reject a lay witness's testimony only upon giving a reason germane to that witness." *Id*. (internal

14  quotation marks and citation omitted).

15      Mr. McBride may not be an acceptable medical source, but the ALJ was required to give

16  germane reasons for rejecting his statements. The ALJ does not provide any explanation as to

17  how Mr. McBride's statements were inconsistent with the medical evidence to allow the court to

18  determine whether her conclusion is supported by substantial evidence.

19      Moreover, the Ninth Circuit has held that "a lack of support from the 'overall medical

20  evidence' is not a proper basis for disregarding [ a lay witness's] observations." *Diedrich v.*

21  *Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017). "The fact that lay testimony and third-party

22  function reports may offer a different perspective than medical records alone is precisely why

23  such evidence is valuable at a hearing." *Id*. (citing *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th

23

1  Cir. 1996) (holding that ALJ erred where ALJ rejected testimony of claimant's family members

2  about claimant's symptoms because the medical records did not corroborate those symptoms).

3           Plaintiff's medical records are admittedly sparse, and Mr. McBride's statements shed light

4  on aspects of Plaintiff's condition that are not discussed in any detail in the medical records.  For

5  instance, the ALJ does not specifically mention Mr. McBride's statements about fecal

6  incontinence or Plaintiff's statement in the record that he did not report this to his providers

7  because of embarrassment. Mr. McBride confirmed Plaintiff's reports of fatigue, which was also

8  noted in his medical records.  Mr. McBride also discussed the lipodystrophy, which Plaintiff

9  tried to testify to before the ALJ, and which is documented in the records (though without any

10 significant discussion) which makes it difficult to sit for long periods of time.

11          The ALJ says that she gave Mr. McBride's statements partial weight because they were

12 less persuasive on the same topics as the opinions of medical professionals relied upon. The

13 medical professionals she relied upon, however, are non-examining physicians who only

14 reviewed Plaintiff's medical records. When compared to a person who observed the plaintiff for

15 more than 17 years, it does not seem that this reason is supported by substantial evidence,

16 particularly when the ALJ did not state what she found disagreeable about his statements.

17 Moreover, the ALJ did not explain how the diagnostic evidence detracted from Mr. McBride's

18 statements.

19          In sum, the court finds the ALJ's conclusion that Mr. McBride's statements should only

20 be given partial weight is not supported by germane reasons and substantial evidence in the

21 record.

22

23

**F. Difficulty During the Hearing and Statistics**

Plaintiff asserts that the ALJ was having difficulty during the hearing because she asked people to repeat things, and asked what year it was. He also questions her "approval ratings," though he seems to be referring to her affirmance ratings.

The Commissioner argues that Plaintiff is required to show that the ALJ's behavior was so extreme as to display a clear inability to render a fair judgment.

*Rollins v. Massanari*, 261 F.3d 853 (9th Cir. 2001), held that a claimant is required "to show that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'" *Rollins*, 261 F.3d at 858 (citing *Liteky v. United States*, 510 U.S. 540, 551 (1994)). Plaintiff has not demonstrated conduct on the part of the ALJ rising to this level; therefore, remand is not proper on this basis.

**G. Remand**

"The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court." *Trevizo v. Berryhill*, 871 F.3d 664, 682 (9th Cir. 2017) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987)). "'[I]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded' for further proceedings." *Id.* (quoting *Garrison*, 759 F.3d at 1019). Generally, courts will remand for benefits where: "'(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand[.]'" *Id.* (quoting *Garrison*, 759 F.3d at 1020).

Here, the court finds that the case should be remanded for further proceedings. Further administrative proceedings would serve a useful purpose—determining whether or not Plaintiff is disabled taking into account Dr. Doumit's opinion, Plaintiff's testimony concerning his daily activities, and Mr. McBride's statements. In other words, while the ALJ failed to provide legally sufficient reasons for rejecting evidence, even if the improperly discredited evidence is credited at true, it is not clear whether the ALJ would be required to find Plaintiff disabled on remand. The ALJ will need to assess Plaintiff's RFC in light of Dr. Doumit's opinions, as well as Plaintiff's testimony and statements, and the statements of Mr. McBride in determining whether there is other work Plaintiff is capable of performing given these limitations.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Plaintiff's motion (ECF No. 16.); **DENYING** the Commissioner's cross-motion (ECF No. 20); and, **REMANDING** this matter for further proceedings consistent with this Report and Recommendation.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: January 25, 2019

_____
William G. Cobb
United States Magistrate Judge